1  JOSEPH P. RUSSONIELLO (CSBN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CSBN 163973)
3  Chief, Criminal Division

4  PHILIP J. KEARNEY (CSBN 114978)
   KYLE F. WALDINGER (ILSB 6238304)
5  Assistant United States Attorneys

6     150 Almaden Boulevard, Suite 900
      San Jose, California 95113
7     Telephone: (408) 535-5061
      Facsimile: (408) 535-5066
8
   Attorneys for Complainant United States of America
9
                  UNITED STATES DISTRICT COURT
10
                NORTHERN DISTRICT OF CALIFORNIA
11
                       SAN JOSE DIVISION
12
   IN THE MATTER OF THE                )   Misc. No. CR08-90409MISC
13 EXTRADITION OF PIERRIE ANTOINE      )
   BATE                                )   COMPLAINT FOR ARREST WITH A VIEW
14                                     )   TOWARDS EXTRADITION (18 U.S.C.
                                       )   § 3184)
15                                     )
                                       )
16                                     )
                                       )
17 _____ )

18        In accordance with Title 18, United States Code, Section 3184 I, the undersigned

19 Assistant United States Attorney, being duly sworn, state on information and belief that the

20 following is true and correct:

21        1.      In this matter, I act for and on behalf of the Government of the United Kingdom

22 of Great Britain and Northern Ireland ("the United Kingdom") with respect to fugitive Pierrie

23 Antoine Bate ("the fugitive"), pursuant to the Extradition Treaty between the Government of

24 United States of America and the United Kingdom, signed March 31, 2003, and entered into

25 force April 26, 2007 (the "Treaty").

26        2.      The United Kingdom has requested the extradition of the fugitive for the purpose

27 of extradition on three charges: (1) burglary with intent to rape, (2) indecent assault, and

28 (3) burglary. This complaint seeks an arrest warrant for the latter two offenses.

          3.      The extradition request is in three parts: (a) a set of documents the original of

COMPLAINT FOR ARREST RE: EXTRADITION

FILED
E-FILING
2008 AUG 14  A 9:36
RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

which is bound with a yellow ribbon, which set contains a declaration from an Attorney-Advisor in the United States Department of State, the diplomatic note from the United Kingdom requesting the fugitive's extradition, and a copy of the Treaty [Exhibit 1 hereto]; (b) a set of documents the original of which is bound with a red ribbon, which set contains the authenticated documentation presented by the United Kingdom in support of the extradition request [Exhibit 2 hereto]; and (c) a set of documents and that represents an as yet uncertified advance copy, supplied to Government counsel by the Office of International Affairs, Criminal Division, U.S. Department of Justice, which set contains a statement clarifying the fugitive's name [Exhibit 3 hereto]. All the exhibits attached hereto are copies, not originals bearing ribbons and seals. Personal identifiers are redacted from Exhibit 2, the only exhibit in which they appeared.

4.    The fugitive is charged in the United Kingdom with the crimes of burglary with intent to rape, indecent assault, and burglary. A "no bail" warrant for the fugitive's arrest on those charges was issued January 17, 2008, by a District Judge of the City of Westminster Magistrates' Court. [Exhibit 2, p. 53 hereof.]

5.    The offenses for which this complaint seeks an arrest warrant — indecent assault and burglary — are covered by the Treaty. [Exhibit 1, p. 9 hereof.] The acts at issue would, were they committed in the United States, violate California Penal Code §§ 314(1) (Indecent Exposure After Having Entered an Inhabited Dwelling without Consent) and 459 (Burglary).

6.    The following facts may reasonably be derived from the extradition request:

a.    On January 17, 2008, Detective Sergeant Annette Maslin of the London Metropolitan Police swore as follows:

i.    She is the officer in charge of the investigation into the fugitive. [Exhibit 2, p. 49 hereof.]

ii.    She is the person who applied for and was granted the arrest warrant described in paragraph 3, above. [Exhibit 2, p. 49 hereof.]

iii.    The facts of the crime were as follows (this summary comes, self-evidently, from the victim's statement and the police's account of their responding to the crime scene):

COMPLAINT FOR ARREST RE: EXTRADITION                                                     -2-

1    On Tuesday 3 October 1995 the victim Ms. Janet DOBSON, who at the time of the

2    incident was 44 years old, was at home in bed in [REDACTED] London [REDACTED].  In the

3    early hours of the morning she awoke to find a man on her bed supporting himself with one arm

4    and masturbating over her with the other hand[;] he also ejaculated over the bedsheets.  When

5    she realised what was happening she shouted at him to leave, he tried to leave by the front door

6    but was unable to as it was double locked, he then walked into the kitchen and exited by a

7    window.  She called the police who arrived soon afterwards.  After examining the flat she found

8    that £200 and three credit cards had been stolen from her handbag.  Ms. DOBSON provided a

9    statement to the police on 10 July 2005.  [Exhibit 2, p. 50 hereof.]

10    iv.    Police took the bedsheet, which had semen on it.  The bedsheet was sent for DNA

11           profiling; however, in 1995, the DNA testing procedure was not advanced enough

12           to obtain a full DNA profile from the semen contained on the bedsheet.  A number

13           of fingerprints and palmprints were also obtained from the crime scene, but no

14           match was found for those prints in 1995.  The investigation was therefore closed.

15           [Exhibit 2, p. 50 hereof.]

16    v.     Between 2004 and 2007, a full case review was commenced by the Metropolitan

17           Police Force and the Crown Prosecution Service.  As part of this review, the

18           DNA, fingerprints, and palmprints were resubmitted for further forensic analysis.

19           Mr. Bate had been convicted of burglary and theft offenses in 1996, and, as a

20           result, his fingerprints and DNA were stored on the National DNA Database.  The

21           semen on the bedsheet was examined using DNA amplification techniques not

22           available in 1995 and a match was found for the fugitive.  The fingerprints and

23           palmprints found inside the victim's home — namely fingerprints on the teapot,

24           palmprints on the inside of the kitchen window frame, and a fingerprint on the

25           drainpipe outside the kitchen window — were examined and found to be a match

26           for the fugitive.  [Exhibit 2, pp. 50–51 hereof.]

27    b.     The fugitive has sustained convictions in Los Angeles County and England.  He

28           has two 1996 convictions in England for "BURGLARY AND THEFT -

COMPLAINT FOR ARREST RE: EXTRADITION                                        -3-

1    DWELLING." [Exhibit 2, pp. 51, 64 hereof.]

2    7.    The fugitive is in this District and therefore within the jurisdiction of this Court.

3    The United States Attorney's Office has been informed by the United States Marshals Service

4    that Bate was most recently in custody in Santa Clara County.

5    WHEREUPON, complainant requests that a warrant be issued, based on probable cause,

6    pursuant to Title 18, United States Code, Section 3184, for the arrest of Pierrie Antoine Bate to

7    answer the instant complaint charging him with being subject to extradition to the United

8    Kingdom for crimes including indecent assault and burglary; that Pierrie Antoine Bate be

9    brought before a judicial officer of this Court and the evidence of criminality heard as required

10    by law; that if on such hearing the judicial officer deems the evidence sufficient under the

11    provisions of the Treaty to sustain any of the charges, the judicial officer certify the same to the

12    Secretary of State in order that a warrant may issue in the discretion of the Secretary for the

13    surrender of Pierrie Antoine Bate to the appropriate authorities of the United Kingdom,

14    according to the Treaty; and that the relevant judicial officers of this Court take such other

15    actions as they are required to take under the provisions of the Treaty and the laws of the United

16    States to meet the obligations of the Treaty.

17    I swear under penalty of perjury that the foregoing is true and correct to the best of my

18    knowledge.

19

20    PHILIP J. KEARNEY
       Assistant United States Attorney

21    Sworn to before me and subscribed in my presence this 14th day of August 2008, at San Jose,
       California.

22

23

24    PATRICIA V. TRUMBULL
       United States Magistrate Judge

25

26

27

28

COMPLAINT FOR ARREST RE: EXTRADITION                                        -4-

Exhibit 1



DISTRICT OF COLUMBIA, ss:

## DECLARATION OF SUSAN TORRES

I, Susan Torres, declare and say as follows:

1. I am an Attorney-Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C. This office has responsibility for extradition requests within the Department of State, and I am familiar with the extradition case of Pierrie Antoine Bate, also known as Peirre Bate, Pierre Antonio Bate, Pierrie Bate. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. In accordance with the provisions of the extradition treaty in full force and effect between the United States and the United Kingdom of Great Britain and Northern Ireland, the British Embassy has submitted a diplomatic note (No. 10/08, dated February 1, 2008) formally requesting the extradition of Pierrie Antoine Bate. A copy of the diplomatic note is attached to this declaration.

3. The relevant and applicable treaty provisions in full force and effect between the United States and the United Kingdom are found in the Extradition Treaty Between the United States of America and the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters ("the Treaty"), signed on March 31, 2003, which entered into force on April 26, 2007. A copy of the treaty is attached to this declaration.

4. In accordance with Article 20 of the Treaty, the Government of the United States appears in court in the United States on behalf of the United Kingdom, and represents the interests of the United Kingdom in any proceeding that arises out of a U.K. request for extradition. The United Kingdom provides the same legal representation in its courts on behalf of the United States with regard to extradition requests made by the United States.

08015203-1

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

...tify That Susan Torres, whose name is subscribed to the document hereunto annexed, was at
...ne... of subscribing the same Attorney Adviser, Office of the Legal Adviser , Department of State,
...nn... ...tates of America, and that full faith and credit are due to her acts as such.

In testimony whereof, I, Condoleezza Rice, Secretary of State , have
hereunto caused the seal of the Department of State to be affixed and my
name subscribed by the Assistant Authentication Officer, of the said
Department, at the city of Washington, in the District of Columbia, this
sixth day of March, 2008.

Secretary of State

By

Assistant Authentication Officer,
Department of State

*pursuant to CHX... ...te of
5, 1789, 1 Stat. ... 22
557; 22USC 265... ...USC
USC 1733 et. se... ...SC
RULE 44 Federa... ...of
...ocedure.*

*This ...ificate is not valid if it is removed or altered in any way whatsoever.*

-2-

5. The offenses for which extradition is sought are covered by Article 2 of the Treaty.

6. The documents submitted by the British Embassy in support of the extradition request were certified on January 22, 2008, by John P. Caulfield, Consul General of the United States of America at London, England, in accordance with Title 18, United States Code, Section 3190. Mr. Caulfield, at the time of his certification, was the principal consular officer of the United States in the United Kingdom.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on March 5, 2008.

_____
SUSAN TORRES

Attachments:

    1. Copy of Note.
    2. Copy of Treaty.

**British Embassy**
**Washington**
**Consular Section**

19 Observatory Circle NW
Washington, D.C 20008-3600

NOTE NO:10/08

Her Britannic Majesty's Embassy present their compliments to the Department of State and have the honour to request the extradition of Pierrie Antoine BATE alias Peirre BATE, Pierre Antonio BATE, Pierrie BATE in accordance with the Extradition Treaty between the United States of America and the United Kingdom of Great Britain and Northern Ireland, and Related Exchange of Letters, signed on March 31, 2003.

Mr Bate's extradition is sought as a person who is accused of burglary with intent to rape on 3 October 1995 contrary to Section 9(1)(a) of the Theft Act 1968, indecent assault on 3 October 1995 contrary to Section 14(1) and Schedule 2 of the Sexual Offences Act 1956, and burglary on 3 October 1995 contrary to Section 9(1)(b) of the Theft Act 1968.

The documents submitted include a warrant, exhibit, and details of previous convictions in the UK and USA, and evidence of identity. There is one original bundle which has been duly authenticated and certified, and two copy sets.

I would be grateful if, in the event of the return being ordered, the Home Secretary could be informed, so that, when appropriate, arrangements can be made for Mr Bate's escort back to the United Kingdom.

Her Majesty's Embassy avail themselves of this opportunity to renew to the Department of State the assurance of their highest consideration.

British Embassy
Washington DC
1 February 2008

| 108TH CONGRESS 2d Session | SENATE | TREATY DOC. 108–23 |
|---|---|---|

# EXTRADITION TREATY WITH GREAT BRITAIN AND NORTHERN IRELAND

---

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

EXTRADITION TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND, AND RELATED EXCHANGES OF LETTERS, SIGNED AT WASHINGTON ON MARCH 31, 2003



APRIL 19, 2004.—The treaty was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and order to be printed for the use of the Senate

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 2004

29–118

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *April 19, 2004.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Extradition Treaty Between the United States of America and the United Kingdom of Great Britain and Northern Ireland, and related exchanges of letters, signed at Washington on March 31, 2003.

In addition, I transmit for the information of the Senate the report of the Department of State with respect to the Treaty. As the report explains, the Treaty will not require implementing legislation.

The provisions in this Treaty follow generally the form and content of modern extradition treaties recently concluded by the United States and will replace the outdated extradition treaty signed in 1972 and the supplementary treaty signed in 1985 that are currently in force between the two countries. The Treaty will, upon entry into force, enhance cooperation between the law enforcement communities of the two countries. It will thereby make a significant contribution to international law enforcement efforts against serious offenses, including terrorism, organized crime, and money laundering offenses.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

GEORGE W. BUSH.

(III)

## LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, October 3, 2003.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Extradition Treaty Between the United States of America and the United Kingdom of Great Britain and Northern Ireland ("the Treaty"), and related exchanges of letters, signed at Washington on March 31, 2003. Upon its entry into force, the Treaty would replace the outdated extradition treaty signed in 1972 and the supplementary treaty signed in 1985 that are now in force between the two countries. I recommend that the Treaty, with related exchanges of letters, be transmitted to the Senate for its advice and consent to ratification.

The Treaty follows generally the form and content of other extradition treaties recently concluded by the United States. The Treaty represents a major step forward in U.S. efforts to strengthen cooperation with countries in the region in combating terrorism, organized crime, money laundering, and other offenses. It is an important part of a concerted effort by the Department of State and the Department of Justice to modernize the legal tools available for the extradition of serious offenders.

The Treaty is designed to be self-executing and will not require implementing legislation.

Article 1 obligates each State to extradite to the other, pursuant to the provisions of the Treaty, persons sought by the authorities in the Requesting State for trial or punishment for extraditable offenses.

Article 2 concerns extraditable offenses. Article 2(1) defines an offense as extraditable if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty. Use of a pure "dual criminality" clause, rather than categories of offenses listed in the Treaty plus other offenses that are listed in relevant UK extradition law and are considered felonies under U.S. law, as in the 1972 extradition treaty, obviates the need to renegotiate or supplement the Treaty as additional offenses become punishable under the laws in both States. Under the 1972 extradition treaty, extradition is to be granted if the offense is defined as extraditable under UK law and as a felony under U.S. law, in addition to the requirement that the offense be punishable by imprisonment or other form of detention for more than one year or by the death penalty.

(V)



VI

Article 2(2) further defines an extraditable offense as including an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any offense described in paragraph 1 of Article 2.

Additional flexibility is provided by Article 2(3), which provides that an offense shall be an extraditable offense (a) whether or not the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology; or (b) whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being jurisdictional only.

With regard to offenses committed outside the territory of the Requesting State, Article 2(4) provides that extradition shall be granted in accordance with the provisions of the Treaty if the laws in the Requested State provide for the punishment of such conduct committed outside its territory in similar circumstances. If the laws in the Requested State do not provide for the punishment of such conduct committed outside of its territory in similar circumstances, the executive authority of the Requested State, in its discretion, may grant extradition provided that all other requirements of the Treaty are met.

Finally, Article 2(5) provides that if extradition is granted for an extraditable offense, it may also be granted for any other offense specified in the request if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met.

Article 3 provides that extradition shall not be refused based on the nationality of the person sought.

Article 4 sets forth bases for the denial of extradition. As is customary in extradition treaties, paragraph 1 provides that extradition shall not be granted if the offense for which extradition is requested constitutes a political offense.

Article 4(2) specifies seven categories of offenses that shall not be considered to be political offenses: (a) an offense for which both Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution; (b) a murder or other violent crime against the person of a Head of State of one of the Parties, or of a member of the Head of State's family; (c) murder, manslaughter, malicious wounding, or inflicting grievous bodily harm; (d) an offense involving kidnaping, abduction, or any form of unlawful detention, including the taking of a hostage; (e) placing or using, or threatening the placement or use of, an explosive, incendiary, or destructive device or firearm capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage; (f) possession of an explosive, incendiary, or destructive device capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage; and (g) an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission

VII

of, or being an accessory before or after the fact to any of the fore-going offenses.

Article 4(3) requires that, notwithstanding the terms of paragraph 2, extradition shall not be granted if the competent authority of the Requested State determines that the request is politically motivated. In the United States, the executive branch is the competent authority for the purposes of the Article. Under the 1985 supplementary treaty, the judicial branch has the authority to consider whether an extradition request is motivated by a desire to punish the person sought on account of race, religion, nationality, or political opinions, or if the person sought would be subject to unfair treatment in UK courts or prisons after extradition. Like all other modern extradition treaties, the new Treaty grants the executive branch rather than the judiciary the authority to determine whether a request is politically motivated.

Article 4(4) provides that the competent authority of the Requested State may also refuse extradition for offenses under military law that are not offenses under ordinary criminal law (e.g., desertion). In the United States, the executive branch is the competent authority for the purposes of the Article.

Article 5(1) provides that extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested. Additionally, under paragraph 2, the Requested State may refuse extradition when the person sought has been convicted or acquitted in a third state in respect of the conduct for which extradition is sought. Article 5(3) provides that extradition shall not be precluded by the fact that the competent authorities of the Requested State: (a) have decided not to prosecute the person sought for the acts for which extradition is requested; (b) have decided to discontinue any criminal proceedings that have been instituted against the person sought for those acts; or (c) are still investigating the person sought for the same acts for which extradition is sought.

Article 6 provides that the decision by the Requested State whether to grant the request for extradition shall be made without regard to any statute of limitations in either State.

Article 7 concerns capital punishment. Under Article 7, when an offense for which extradition is sought is punishable by death under the laws in the Requesting State but not under the laws in the Requested State, the executive authority in the Requested State may refuse extradition unless the Requesting State provides an assurance that the death penalty will not be imposed or, if imposed, will not be carried out. The United States has agreed to similar formulations in other modern extradition treaties (e.g., those with France, Poland, Argentina, the Republic of Korea, India, and Peru).

Article 8 establishes the procedures and describes the documents that are required to support a request for extradition. All requests for extradition shall be submitted through the diplomatic channel. Among other requirements, Article 8(3) provides that a request for the extradition of a person sought for prosecution must be supported by: (a) a copy of the warrant or order of arrest issued by a judge or other competent authority; (b) a copy of the charging document, if any; and (c) for requests to the United States, such infor-



VIII

mation as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought. The Treaty will not change the evidentiary burden required for extradition requests to the United States, but the Treaty's entry into force will allow the United States to take advantage of the United Kingdom Extradition Act of 1989, which applies only to treaties that enter into force after 1989. Under the 1989 Act, the evidentiary requirements for extradition from the United Kingdom are lowered from a "prima facie" standard to "evidence sufficient for issuance of a warrant," which is analogous to the U.S. probable cause standard.

Article 9 establishes the procedures under which documents submitted to support an extradition request shall be deemed to be authentic and received in evidence.

Under Article 10, if the Requested State requires additional information to enable a decision to be taken on the request for extradition, the Requesting State shall respond to the request within such time as the Requested State requires.

Article 11 provides that all documents submitted under the Treaty by the Requesting State shall be in English or accompanied by a translation into English.

Article 12 sets forth procedures and describes the information that is required for the provisional arrest and detention of the person sought, in an urgent situation, pending presentation of the formal request for extradition. In particular, Article 12(4) provides that if the Requested State's executive authority has not received the extradition request and supporting documents required by Article 8 within sixty (60) days from the date of provisional arrest, the person may be discharged from custody. Article 12(5) explicitly provides that such a discharge from custody shall not prejudice the subsequent re-arrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

Article 13 specifies the procedures governing a decision on the extradition request and the surrender of the person sought. It requires the Requested State to promptly notify the Requesting State of its decision regarding a request. Such notification should be transmitted through the diplomatic channel directly to the competent authority designated by the Requesting State to receive such notification. If the request is denied in whole or in part, the Requested State must provide reasons for the denial and, upon request, copies of pertinent judicial decisions. If extradition is granted, the States shall agree on the time and place for the surrender of the person sought. If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, the person may be discharged from custody, and the Requested State, in its discretion, may subsequently refuse extradition for the same offense(s).

Article 14 addresses temporary and deferred surrender. Article 14(1) provides that if a person whose extradition is sought is being proceeded against or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person to the Requesting State for the purpose of prosecution. If the Requested State requests, the Requesting State shall keep the person so sur-

rendered in custody and shall return that person to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the States. Alternatively, under Article 14(2), the Requested State may postpone extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State. The postponement may continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed.

Article 15 provides a non-exclusive list of factors to be considered by the executive authority of the Requested State in determining to which State to surrender a person whose extradition is sought by more than one State.

Article 16 provides that the Requested State may, to the extent permitted under its law, seize and surrender to the Requesting State all items and assets, including proceeds, that are connected with the offense in respect of which extradition is granted. Such items and assets may be surrendered even if the extradition cannot be carried out due to the death, disappearance, or escape of the person sought. The Requested State may condition the surrender of the items upon satisfactory assurances that the property will be returned to the Requested State as soon as practicable. The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State.

Article 17 permits surrender as expeditiously as possible and without further proceedings if the person sought waives extradition and agrees to be surrendered to the Requesting State.

Article 18 sets forth the rule of specialty under international law. Paragraph 1 provides, subject to specific exceptions set forth in paragraph 3, that a person extradited under the Treaty may not be detained, tried, or punished in the Requesting State except for: (a) Any offense for which extradition was granted, or a differently denominated offense based on the same facts as the offense for which extradition was granted, provided such offense is extraditable, or is a lesser included offense; (b) any offense committed after the extradition of the person; or (c) any offense for which the executive authority of the Requested State waives the rule of specialty and thereby consents to the person's detention, trial, or punishment. The treaty currently in place does not contain such a provision for waiver of the rule of specialty, and the preferred practice of States is not to waive the rule of specialty unless there is a treaty provision authorizing them to do so.

Article 18(2) provides that a person extradited under the Treaty may not be the subject of onward extradition or surrender for any offense committed prior to the extradition to the Requesting State unless the Requested State consents. The Treaty's use of the term "surrender" (the operable term in the Rome Statute of the International Criminal Court) makes explicit that the United Kingdom will not surrender to the ICC any person extradited by the United States. The United Kingdom has recorded in a separate letter its understanding that the Treaty continues the protection implicit in the current treaty against surrender to the ICC of fugitives extradited by the United States and states in its letter that it will con-

x

test any request from the ICC for such surrender as being inconsistent with Article 98(2) of the Rome Statute.

Under Article 18(3), these restrictions shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of a person to a third State, if the extradited person leaves the territory of the Requesting State after extradition and voluntarily returns to it or fails to leave the territory of the Requesting State within twenty (20) days of being free to do so.

Article 19 governs the transit through the territory of one State of a person being surrendered to the other State by a third State or from the other State to a third State.

Article 20 contains provisions on representation and expenses that are similar to those found in other modern U.S. extradition treaties. Specifically, the Requested State is required to advise, assist, and appear in court on behalf of the Requesting State in any proceedings in the courts of the Requested State arising out of a request for extradition or make all necessary arrangements for the same. The Requested State also bears all expenses incurred in that State in connection with the extradition proceedings, except that the Requesting State pays expenses related to the translation of extradition documents and the transportation of the person surrendered. Article 20(3) specifies that neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons under the Treaty.

Article 21 provides that the Parties may consult with each other in connection with the processing of individual cases and in furtherance of efficient implementation of the Treaty.

Article 22 concerns the application of the Treaty. Paragraph 1 makes the Treaty applicable to offenses committed before as well as after the date of entry into force.

Under paragraph Article 22(2), the Treaty shall apply to the United States of America and, in relation to the United Kingdom, to Great Britain and Northern Ireland, the Channel Islands, the Isle of Man, and to any territory for whose international relations the United Kingdom is responsible and to which the Treaty has been extended by agreement of the Parties. Article 22(3) provides that the application of the Treaty to any territory in respect of which extension has been made in accordance with paragraph 2 may be terminated by either State giving six months' written notice to the other through the diplomatic channel.

Pursuant to Article 22(4), a request by the United States for the extradition of an offender who is found in any of the territories to which this Treaty applies in accordance with paragraph 2 of the Article may be made to the Governor or other competent authority of that territory. A request on the part of any of the territories to which this Treaty applies in accordance with paragraph 2 of the Article for the extradition of an offender who is found in the United States of America may be made to the Government of the United States by the Governor or other competent authority of that territory. This paragraph streamlines the extradition procedures regarding requests to and from UK territories, as such requests currently must go through the United Kingdom's central authority in London.

XI

Article 23 contains clauses dealing with the Treaty's ratification and entry into force. Paragraphs 1 and 2 provide that the Treaty is subject to ratification and will enter into force upon the exchange of instruments of ratification, which is to take place as soon as possible.

Article 23(3) provides that, upon entry into force of the Treaty, the Extradition Treaty signed at London on June 8, 1972, and the Supplementary Treaty signed at Washington on June 25, 1985, (together "the prior Treaty") shall cease to have any effect as between the United States and the United Kingdom, subject to certain exceptions. The prior Treaty shall apply to any extradition proceedings in which the extradition documents have already been submitted to the courts of the Requested State at the time the Treaty enters into force, except that Article 18 of this Treaty relating to the rule of specialty shall apply to persons found extraditable under the prior Treaty. The prior Treaty shall also apply to any territory to which it has been extended in accordance with Article II of that Treaty, until such time as the provisions of this Treaty have been extended to such a territory under Article 22(2).

Article 24 provides that either State may terminate the Treaty at any time by giving written notice to the other State through the diplomatic channel. Such termination shall be effective six months after the date of receipt of such notice.

The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate at the earliest possible date.

Respectfully submitted.

COLIN L. POWELL.

EXTRADITION TREATY
BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN
AND NORTHERN IRELAND

(1)

2

TABLE OF CONTENTS

Article 1 ............................................................ Obligation to Extradite

Article 2 ............................................................ Extraditable Offenses

Article 3 ............................................................ Nationality

Article 4 ............................................................ Political and Military
                                                                    Offenses

Article 5 ............................................................ Prior Prosecution

Article 6 ............................................................ Statute of Limitations

Article 7 ............................................................ Capital Punishment

Article 8 ............................................................ Extradition Procedures and
                                                                    Required Documents

Article 9 ............................................................ Authentication of Documents

Article 10 .......................................................... Additional Information

Article 11 .......................................................... Translation

Article 12 .......................................................... Provisional Arrest

Article 13 .......................................................... Decision and Surrender

Article 14 .......................................................... Temporary and
                                                                    Deferred Surrender

Article 15 .......................................................... Requests for Extradition
                                                                    Made by Several States

Article 16 .......................................................... Seizure and Surrender of
                                                                    Property

Article 17 .......................................................... Waiver of Extradition

Article 18 .......................................................... Rule of Specialty

Article 19 .......................................................... Transit

Article 20 .......................................................... Representation and Expenses

Article 21 .......................................................... Consultation

Article 22 .......................................................... Application

Article 23 .......................................................... Ratification and Entry into
                                                                    Force

Article 24 .......................................................... Termination

3

The Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland,

Recalling the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed at London, June 8, 1972, as amended by the Supplementary Treaty between the two States, signed at Washington, June 25, 1985; and

Desiring to provide for more effective cooperation between the two States in the suppression of crime, and, for that purpose, to conclude a new treaty for the extradition of offenders;

Have agreed as follows:

4

## Article 1

### Obligation to Extradite

The Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons sought by the authorities in the Requesting State for trial or punishment for extraditable offenses.

## Article 2

### Extraditable Offenses

1.      An offense shall be an extraditable offense if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty.

2.      An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any offense described in paragraph 1 of this Article.

3.      For the purposes of this Article, an offense shall be an extraditable offense:

      (a)      whether or not the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology; or

      (b)      whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being jurisdictional only.

4.      If the offense has been committed outside the territory of the Requesting State, extradition shall be granted in accordance with the provisions of the Treaty if the laws in the Requested State provide for the punishment of such conduct committed outside its territory in similar circumstances. If the laws in the Requested State do not provide for the punishment of such conduct committed outside of its territory in similar circumstances, the executive authority of the Requested State, in its discretion, may grant extradition provided that all other requirements of this Treaty are met.

5

5.    If extradition has been granted for an extraditable offense, it may also be granted for any other offense specified in the request if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met.

## Article 3

### Nationality

Extradition shall not be refused based on the nationality of the person sought.

## Article 4

### Political and Military Offenses

1.    Extradition shall not be granted if the offense for which extradition is requested is a political offense.

2.    For the purposes of this Treaty, the following offenses shall not be considered political offenses:

(a)    an offense for which both Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

(b)    a murder or other violent crime against the person of a Head of State of one of the Parties, or of a member of the Head of State's family;

(c)    murder, manslaughter, malicious wounding, or inflicting grievous bodily harm;

(d)    an offense involving kidnaping, abduction, or any form of unlawful detention, including the taking of a hostage;

(e)    placing or using, or threatening the placement or use of, an explosive, incendiary, or destructive device or firearm capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(f)    possession of an explosive, incendiary, or destructive device capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

6

(g)   an attempt or a conspiracy to commit, participation in the
commission of, aiding or abetting, counseling or procuring the
commission of, or being an accessory before or after the fact to
any of the foregoing offenses.

3.    Notwithstanding the terms of paragraph 2 of this Article, extradition
shall not be granted if the competent authority of the Requested State determines that
the request was politically motivated. In the United States, the executive branch is the
competent authority for the purposes of this Article.

4.    The competent authority of the Requested State may refuse extradition
for offenses under military law that are not offenses under ordinary criminal law. In
the United States, the executive branch is the competent authority for the purposes of
this Article.

## Article 5

### Prior Prosecution

1.    Extradition shall not be granted when the person sought has been
convicted or acquitted in the Requested State for the offense for which extradition is
requested.

2.    The Requested State may refuse extradition when the person sought
has been convicted or acquitted in a third state in respect of the conduct for which
extradition is requested.

3.    Extradition shall not be precluded by the fact that the competent
authorities of the Requested State:

(a)   have decided not to prosecute the person sought for the acts for
which extradition is requested;

(b)   have decided to discontinue any criminal proceedings which
have been instituted against the person sought for those acts; or

(c)   are still investigating the person sought for the same acts for
which extradition is sought.

## Article 6

### Statute of Limitations

The decision by the Requested State whether to grant the request for
extradition shall be made without regard to any statute of limitations in either State.

7

### Article 7

### Capital Punishment

When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the executive authority in the Requested State may refuse extradition unless the Requesting State provides an assurance that the death penalty will not be imposed or, if imposed, will not be carried out.

### Article 8

### Extradition Procedures and Required Documents

1.    All requests for extradition shall be submitted through the diplomatic channel.

2.    All requests for extradition shall be supported by:

   (a)    as accurate a description as possible of the person sought, together with any other information that would help to establish identity and probable location;

   (b)    a statement of the facts of the offense(s);

   (c)    the relevant text of the law(s) describing the essential elements of the offense for which extradition is requested;

   (d)    the relevant text of the law(s) prescribing punishment for the offense for which extradition is requested; and

   (e)    documents, statements, or other types of information specified in paragraphs 3 or 4 of this Article, as applicable.

3.    In addition to the requirements in paragraph 2 of this Article, a request for extradition of a person who is sought for prosecution shall be supported by:

   (a)    a copy of the warrant or order of arrest issued by a judge or other competent authority;

   (b)    a copy of the charging document, if any; and

   (c)    for requests to the United States, such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is requested.



8

4.    In addition to the requirements in paragraph 2 of this Article, a request for extradition relating to a person who has been convicted of the offense for which extradition is sought shall be supported by:

(a)    information that the person sought is the person to whom the finding of guilt refers;

(b)    a copy of the judgment or memorandum of conviction or, if a copy is not available, a statement by a judicial authority that the person has been convicted;

(c)    a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

(d)    in the case of a person who has been convicted *in absentia*, information regarding the circumstances under which the person was voluntarily absent from the proceedings.

Article 9

Authentication of Documents

The documents that support an extradition request shall be deemed to be authentic and shall be received in evidence in extradition proceedings without further proof if:

(a)    regarding a request from the United States

(i)    they are authenticated by the oath of a witness, or

(ii)    they purport to be signed by a judge, magistrate, or officer of the United States and they purport to be certified by being sealed with the official seal of the Secretary of State of the United States;

(b)    regarding a request from the United Kingdom, they are certified by the principal diplomatic or principal consular officer of the United States resident in the United Kingdom, as provided by the extradition laws of the United States;

(c)    regarding a request from a territory of the United Kingdom, they are certified either by the principal diplomatic or principal consular officer of the United States responsible for that territory; or



9

(d)    regarding a request from either Party, they are certified or
authenticated in any other manner acceptable under the law in
the Requested State.

## Article 10

### Additional Information

If the Requested State requires additional information to enable a decision to
be taken on the request for extradition, the Requesting State shall respond to the
request within such time as the Requested State requires.

## Article 11

### Translation

All documents submitted under this Treaty by the Requesting State shall be in
English or accompanied by a translation into English.

## Article 12

### Provisional Arrest

1.    In an urgent situation, the Requesting State may request the provisional
arrest of the person sought pending presentation of the request for extradition. A
request for provisional arrest may be transmitted through the diplomatic channel or
directly between the United States Department of Justice and such competent
authority as the United Kingdom may designate for the purposes of this Article.

2.    The application for provisional arrest shall contain:

(a)    a description of the person sought;

(b)    the location of the person sought, if known;

(c)    a brief statement of the facts of the case including, if possible,
the date and location of the offense(s);

(d)    a description of the law(s) violated;

(e)    a statement of the existence of a warrant or order of arrest or a
finding of guilt or judgment of conviction against the person
sought; and

10

(f)    a statement that the supporting documents for the person sought
will follow within the time specified in this Treaty.

3.    The Requesting State shall be notified without delay of the disposition
of its request for provisional arrest and the reasons for any inability to proceed with
the request.

4.    A person who is provisionally arrested may be discharged from
custody upon the expiration of sixty (60) days from the date of provisional arrest
pursuant to this Treaty if the executive authority of the Requested State has not
received the formal request for extradition and the documents supporting the
extradition request as required in Article 8. For this purpose, receipt of the formal
request for extradition and supporting documents by the Embassy of the Requested
State in the Requesting State shall constitute receipt by the executive authority of the
Requested State.

5.    The fact that the person sought has been discharged from custody
pursuant to paragraph 4 of this Article shall not prejudice the subsequent re-arrest and
extradition of that person if the extradition request and supporting documents are
delivered at a later date.

Article 13

Decision and Surrender

1.    The Requested State shall promptly notify the Requesting State of its
decision on the request for extradition. Such notification should be transmitted
directly to the competent authority designated by the Requesting State to receive such
notification and through the diplomatic channel.

2.    If the request is denied in whole or in part, the Requested State shall
provide reasons for the denial. The Requested State shall provide copies of pertinent
judicial decisions upon request.

3.    If the request for extradition is granted, the authorities of the
Requesting and Requested States shall agree on the time and place for the surrender of
the person sought.

4.    If the person sought is not removed from the territory of the Requested
State within the time period prescribed by the law of that State, that person may be
discharged from custody, and the Requested State, in its discretion, may subsequently
refuse extradition for the same offense(s).

11

## Article 14

### Temporary and Deferred Surrender

1.    If the extradition request is granted for a person who is being proceeded against or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution.  If the Requested State requests, the Requesting State shall keep the person so surrendered in custody and shall return that person to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the States.

2.    The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State.  The postponement may continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed.

## Article 15

### Requests for Extradition Made by Several States

If the Requested State receives requests from two or more States for the extradition of the same person, either for the same offense or for different offenses, the executive authority of the Requested State shall determine to which State, if any, it will surrender the person.  In making its decision, the Requested State shall consider all relevant factors, including but not limited to:

(a)    whether the requests were made pursuant to a treaty;

(b)    the place where each offense was committed;

(c)    the gravity of the offenses;

(d)    the possibility of any subsequent extradition between the respective Requesting States; and

(e)    the chronological order in which the requests were received from the respective Requesting States.

## Article 16

### Seizure and Surrender of Property

1.    To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all items in whatever form, and assets, including

12

proceeds, that are connected with the offense in respect of which extradition is granted. The items and assets mentioned in this Article may be surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2.    The Requested State may condition the surrender of the items upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable. The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State.

### Article 17

#### Waiver of Extradition

If the person sought waives extradition and agrees to be surrendered to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings.

### Article 18

#### Rule of Specialty

1.    A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a)    any offense for which extradition was granted, or a differently denominated offense based on the same facts as the offense on which extradition was granted, provided such offense is extraditable, or is a lesser included offense;

(b)    any offense committed after the extradition of the person; or

(c)    any offense for which the executive authority of the Requested State waives the rule of specialty and thereby consents to the person's detention, trial, or punishment. For the purpose of this subparagraph:

(i)    the executive authority of the Requested State may require the submission of the documentation called for in Article 8; and

(ii)    the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request for consent is being processed.

13

2.      A person extradited under this Treaty may not be the subject of onward extradition or surrender for any offense committed prior to extradition to the Requesting State unless the Requested State consents.

3.      Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of the person to a third State, if the person:

(a)     leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

(b)     does not leave the territory of the Requesting State within 20 days of the day on which that person is free to leave.

4.      If the person sought waives extradition pursuant to Article 17, the specialty provisions in this Article shall not apply.


Article 19

Transit

1.      Either State may authorize transportation through its territory of a person surrendered to the other State by a third State or from the other State to a third State.  A request for transit shall contain a description of the person being transported and a brief statement of the facts of the case.  A person in transit shall be detained in custody during the period of transit.

2.      Authorization is not required when air transportation is used by one State and no landing is scheduled on the territory of the other State.  If an unscheduled landing does occur, the State in which the unscheduled landing occurs may require a request for transit pursuant to paragraph 1 of this Article, and it may detain the person until the request for transit is received and the transit is effected, as long as the request is received within 96 hours of the unscheduled landing.


Article 20

Representation and Expenses

1.      The Requested State shall advise, assist, and appear on behalf of, the Requesting State in any proceedings in the courts of the Requested State arising out of a request for extradition or make all necessary arrangements for the same.

2.      The Requesting State shall pay all the expenses related to the translation of extradition documents and the transportation of the person surrendered. The Requested State shall pay all other expenses incurred in that State in connection with the extradition proceedings.

14

3.    Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons under this Treaty.

Article 21

Consultation

The Parties may consult with each other in connection with the processing of individual cases and in furtherance of efficient implementation of this Treaty.

Article 22

Application

1.    This Treaty shall apply to offenses committed before as well as after the date it enters into force.

2.    This Treaty shall apply:

(a) in relation to the United Kingdom: to Great Britain and Northern Ireland, the Channel Islands, the Isle of Man; and to any territory for whose international relations the United Kingdom is responsible and to which this agreement has been extended by agreement of the Parties; and

(b) to the United States of America.

3.    The application of this Treaty to any territory in respect of which extension has been made in accordance with paragraph 2 of this Article may be terminated by either State giving six months' written notice to the other through the diplomatic channel.

4.    A request by the United States for the extradition of an offender who is found in any of the territories to which this Treaty applies in accordance with paragraph 2 of this Article may be made to the Governor or other competent authority of that territory, who may take the decision himself or refer the matter to the Government of the United Kingdom for its decision.  A request on the part of any of the territories to which this Treaty applies in accordance with paragraph 2 of this Article for the extradition of an offender who is found in the United States of America may be made to the Government of the United States by the Governor or other competent authority of that territory.

15

### Article 23

#### Ratification and Entry into Force

1.   This Treaty shall be subject to ratification; the instruments of ratification shall be exchanged as soon as possible.

2.   This Treaty shall enter into force upon the exchange of the instruments of ratification.

3.   Upon the entry into force of this Treaty, the Extradition Treaty signed at London on June 8, 1972, and the Supplementary Treaty signed at Washington on June 25, 1985, (together, "the prior Treaty") shall cease to have any effect as between the United States and the United Kingdom, except as otherwise provided below. The prior Treaty shall apply to any extradition proceedings in which the extradition documents have already been submitted to the courts of the Requested State at the time this Treaty enters into force, except that Article 18 of this Treaty shall apply to persons found extraditable under the prior Treaty.

4.   The prior Treaty shall also apply to any territory to which it has been extended in accordance with Article II of that Treaty, until such time as the provisions of this Treaty have been extended to such a territory under Article 22(2).

### Article 24

#### Termination

Either State may terminate this Treaty at any time by giving written notice to the other State through the diplomatic channel, and the termination shall be effective six months after the date of receipt of such notice.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE at *Washington*, in duplicate, this 31 day of *March*, 2003.

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE
UNITED KINGDOM OF GREAT BRITAIN
AND NORTHERN IRELAND:

16

31 March 2003

Dear Mr. Attorney General:

I have the honour to acknowledge receipt of your Letter of today's date, which reads as follows:

"I have the honor to refer to the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland (the Treaty) signed today. I have the honor to propose that the Treaty be applied in accordance with the provisions set out in this Letter.

With regard to Article 22(2)(b) of the Treaty, the United States notes that Article 29 of the Vienna Convention on the Law of Treaties regarding the Territorial Scope of Treaties states: "Unless a different intention appears from the treaty or is otherwise established, a treaty is binding upon each party in respect of its entire territory." The entire territory of the United States encompasses, in addition to the fifty states and the District of Columbia: American Samoa, Baker Island, Guam, Howland Island, Jarvis Island, Johnston Atoll, Kingman Reef, Midway Islands, Navassa Island, Northern Mariana Islands, Palmyra Atoll, Puerto Rico, U.S. Virgin Islands, and Wake Island.

If the above proposal is acceptable to the Government of the United Kingdom of Great Britain and Northern Ireland, I have the honor to propose that this Letter and and your reply to that effect will place on record the understanding of our two Governments on the matter, which will come into operation on the date of entry into force of the Treaty."

I have the further honour to inform you that the foregoing proposal is acceptable to the Government of the United Kingdom of Great Britain and Northern Ireland and that your Letter of today's date and this Letter will place on record the understanding of our two Governments on the matter, which will come into operation on the date of entry into force of the Treaty.

Sincerely,

Rt. Hon. David Blunkett MP
Secretary of State for the
Home Department

17

31 March 2003

Dear Mr. Attorney General:

I have the honour to refer to the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland (the Treaty) signed today. I have the honour to propose that the Treaty be applied in accordance with the understanding set out in this Letter.

The United Kingdom confirms that the provision in Article 18(2) of the Treaty, which precludes the onward extradition or surrender of a person extradited under the treaty, applies to preclude in accordance with that provision the onward surrender to the International Criminal Court (ICC) of a person extradited from the United States. Accordingly, the United Kingdom would contest any request from the ICC for such surrender, as being incompatible with Article 98(2) of the Statute of the ICC.

If the above proposal is acceptable to the Government of the United States of America, I have the honour to propose that this Letter and your reply to that effect will place on record the understanding of our two Governments on the matter, which will come into operation on the date of entry into force of the Treaty.

Sincerely,

Rt. Hon. David Blunkett MP
Secretary of State for the
Home Department

18

March 31, 2003

Dear Mr. Secretary:

I have the honor to refer to the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland (the Treaty) signed today. I have the honor to propose that the Treaty be applied in accordance with the provisions set out in this Letter.

With regard to Article 22(2)(b) of the Treaty, the United States notes that Article 29 of the Vienna Convention on the Law of Treaties regarding the Territorial Scope of Treaties states: "Unless a different intention appears from the treaty or is otherwise established, a treaty is binding upon each party in respect of its entire territory." The entire territory of the United States encompasses, in addition to the fifty states and the District of Columbia: American Samoa, Baker Island, Guam, Howland Island, Jarvis Island, Johnston Atoll, Kingman Reef, Midway Islands, Navassa Island, Northern Mariana Islands, Palmyra Atoll, Puerto Rico, U.S. Virgin Islands, and Wake Island.

If the above proposal is acceptable to the Government of the United Kingdom of Great Britain and Northern Ireland, I have the honor to propose that this Letter and your reply to that effect will place on record the understanding of our two Governments on the matter, which will come into operation on the date of entry into force of the Treaty.

Sincerely,

John Ashcroft
Attorney General
United States Department
of Justice

19

March 31, 2003

Dear Mr. Secretary:

I have the honor to acknowledge receipt of your Letter of today's date, which reads as follows:

"I have the honour to refer to the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland (the Treaty) signed today. I have the honour to propose that the Treaty be applied in accordance with the understanding set out in this Letter.

The United Kingdom confirms that the provision in Article 18(2), which precludes the onward extradition or surrender of a person extradited under the treaty, applies to preclude in accordance with that provision the onward surrender to the International Criminal Court ("ICC") of a person extradited from the United States. Accordingly, the United Kingdom would contest any request from the ICC for such surrender, as being incompatible with Article 98(2) of the Statute of the ICC.

If the above proposal is acceptable to the Government of the United States of America, I have the honour to propose that this Letter and your reply to that effect will place on record the understanding of our two Governments on the matter, which will come into operation on the date of entry into force of the Treaty."

I have the further honor to inform you that the foregoing proposal is acceptable to the Government of the United States of America and that your Letter of today's date and this Letter will place on record the understanding of our two Governments in this matter, which will come into operation on the date of entry into force of the Treaty.

Sincerely,

*John Ashcroft*

John Ashcroft
Attorney General
United States Department
of Justice

# THE EXTRADITION

# OF

# PIERRIE ANTOINE BATE

# FROM

# THE
# UNITED STATES OF AMERICA

EXHIBIT 2

# THE EXTRADITION

## OF

## PIERRIE ANTOINE BATE

## FROM

## THE UNITED STATES OF AMERICA

### INDEX TO EXTRADITION REQUEST

| DOCUMENT | PAGE NO |
|---|---|
| Statement of Benjamin Keith | 1 – 8 |
| Statement of Anette Muslin | 9 – 12 |
| Exhibit AM/1 – Warrant | 13 |
| Exhibit AM/2 – Photograph of Bate | 14 |
| Exhibit AM/3 – Fingerprints of Bate | 15 – 20 |
| Exhibit AM/4 – Previous Convictions of Bate | 21 – 25 |
| Jurat | 26 |

EXHIBIT 2

**BENJAMIN KEITH** states as follows:-

I am a Barrister at Law of England and Wales and a Crown Prosecutor employed by the Crown Prosecution Service of England and Wales. I am well acquainted in the Laws of England and Wales.

PIERRIE ANTOINE BATE ("Mr BATE") is wanted in England for the purposes of prosecuting for the following offences:

1. **Burglary with intent to rape:**
   Mr BATE on Tuesday 3 October 1995 October 1995 entered the property in ████████████, London, ████ with the intent to commit rape, contrary to section 9(1)(a) of the Theft Act 1968.

2. **Indecent Assault:**
   Mr BATE on Tuesday 3 October 1995 at ████████████ London, ████ indecently assaulted Ms Janet Dobson a woman over the age of 16 contrary to section 14(1) and Schedule 2 of the Sexual Offenders Act 1956.

3. **Burglary:**
   Mr BATE on Tuesday 3 October 1995 entered the property in ████████ ████ London, ████ and stole property belonging to Ms Janet Dobson, contrary to section 9(1)(b) of the Theft Act 1968.

The law in relation to each of the offences for which he is sought are set out below:-

**Burglary with intent to rape**

**Definition**

Burglary is an offence contrary to section 9 of the Theft Act 1968.

By Section 9 of the Theft Act 1968:-

EXHIBIT 2    **1**

(1) A person is guilty of burglary if -

    (a) he enters any building or part of a building as a trespasser and with intent to commit any such offence as is mentioned in subsection (2) below; or

    (b) having entered any building or part of a building as a trespasser he steals or attempts to steal anything in the building or that part of it or inflicts or attempts to inflict on any person therein any grievous bodily harm.

(2) The offences referred to in subsection (1)(a) above are offences of stealing anything in the building or part of a building in question, of inflicting on any person therein any grievous bodily harm or raping any woman therein, and of doing unlawful damage to the building or anything therein.

(3) A person guilty of burglary shall on conviction on indictment be liable to imprisonment for a term not exceeding -

    (a) where the offence was committed in respect of a building or part of a building which is a dwelling, fourteen years;

    (b) in any other case, ten years.

Rape is defined by section 1(2) of the Sexual Offences Act 1956

(1) ...

(2) a man commits rape if —

    (a) he has sexual intercourse with a person (whether vaginal or anal) who at the time of the intercourse does not consent to it; and

    (b) at the time he knows that the person does not consent to the intercourse or is reckless as to whether that person consents to it.

**Elements of the offence**

To prove the charge of burglary with intent to rape the prosecution must prove the following elements:

2

EXHIBIT 2

2

1. That the defendant entered a building as a trespasser. Trespasser means a person who enters in excess of permission, or without consent from the person in possession of the building.

2. That the defendant intended to commit rape which is one of the offences specified in section 9(2) of the Theft Act 1968, in that the defendant intended to have sexual intercourse with the occupant without her consent.

There is no time limit on the institution of proceedings for an offence of burglary.

The maximum sentence for burglary is 14 years imprisonment see section 9(1)(3) of the Theft Act 1968 above.

**Indecent Assault**

Indecent Assault on a female is an offence contrary to Section 14(1) of the Sexual Offences Act 1956.

By Section 14 of the Sexual Offences Act 1956:-

(1) *It is an offence, subject to the exception mentioned in subsection (3) of this section, for a person to make an indecent assault on a woman.*

(2) *A girl under the age of sixteen cannot in law give any consent which would prevent an act being an assault for the purposes of this section.*

(3) *Where a marriage is invalid under Section Two of the Marriage Act 1949, or Section 1 of the Age of Marriage Act 1929 (the wife being a girl under the age of 16), the invalidity does not make the husband guilty of any offence under this section by reason of her incapacity to consent while under that age., if he believes her to be his wife and has reasonable cause for the belief.*

EXHIBIT 2                    3

**Elements of the offence**

On a charge of indecent assault the prosecution must prove:-

1. That the accused intentionally assaulted the victim. The courts have held that an assault is the apprehension of physical contact or any intentional touching of another without consent or lawful excuse. There need be no aggression shown; any contact or attempt at contact is sufficient.

2. That the assault, or the assault and the circumstances accompanying it, are capable of being considered by right-minded persons as indecent; and

3. That the accused intended to commit such an assault.

The maximum penalty for the offence of indecent assault on a female is a term of imprisonment not exceeding 10 years.

There is no time limit on the institution of proceedings by the Crown for the offence of indecent assault on a female.

**Burglary**

Burglary is defined in the same way as burglary with intent to commit rape explained above with only that the defendant steals (commits theft) after entering as a trespasser.

**Theft**

By section 1 of the Theft Act 1968:-

*(1) A person is guilty of theft if he dishonestly appropriates property belonging to another with the intention of permanently depriving the other of it; and "thief" and "steal" shall be construed accordingly.*

44        4                              EXHIBIT 2

4

(2) It is immaterial whether the appropriation is made with a view to gain, or is made for the thief's own benefit.

(3) The five following sections of this Act shall have effect as regards the interpretation and operation of this section (and, except as otherwise provided by this Act, shall apply only for purposes of this section).

By section 4 of the Theft Act 1968:-

"Property" includes money and all other property, real or personal, including things in action and other intangible property.

By section 5 of the Theft Act 1968:-

Property shall be regarded as belonging to any person having possession or control of it, or having in it any proprietary right or interest (not being an equitable interest arising only from an agreement to transfer or grant an interest).

By section 6 of the Theft Act 1968:-

A person appropriating property belonging to another without meaning the other permanently to lose the thing itself is nevertheless to be regarded as having the intention of permanently depriving the other of it if his intention is to treat the thing as his own to dispose of regardless of the other's rights; and a borrowing or lending of it may amount to so treating it if, but only if, the borrowing or lending is for a period and in circumstances making it equivalent to an outright taking or disposal.

"Dishonestly" is not defined in the Theft Act 1968. Section 2 above merely sets out certain circumstances in which an appropriation of property will not, in law, be dishonest. Whether an accused has acted dishonestly is a matter to be determined in two stages. First, it must be decided whether according to the ordinary standards of reasonable and honest people what was done was dishonest. If it was not dishonest by those standards, that is the end of the matter and the prosecution fails. If it was dishonest by those standards then a second question must be considered. That is, whether the accused himself must have realised that what he was doing was by the standards of reasonable and honest people, dishonest. It is dishonest for a defendant to act in a way

**5**

EXHIBIT 2

which he knows ordinary people consider to be dishonest, even if he asserts or genuinely believes that he was morally justified in acting as he did.

There is no time limit on the institution of proceedings for an offence of burglary.

The maximum sentence for burglary is 14 years imprisonment

There is no time limit on the institution of proceedings for an offence of burglary.

## SPECIALITY:

By virtue of the Extradition Act 2003 and the Extradition Act 2003 (Commencement and Savings) Order 2003 (Statutory Instrument 2003 No. 3103), the United States of America has been designated a category 2 territory for the purposes of extradition.

By virtue of section 151 of the Extradition Act 2003:-

(2) The person may be dealt with in the United Kingdom for an offence committed before his extradition only if-

(a)        the offence is one falling within subsection (3), or

(b)        the condition in subsection (4) is satisfied.

(3) The offences are--

(a)        the offence in respect of which the person is extradited;

(b)        an offence disclosed by the information provided to the category 2 territory in respect of that offence;

(c)        an offence in respect of which consent to the person being dealt with is given on behalf of the territory.

46        6        EXHIBIT 2

6

(4)          The condition is that--

(a)          the person has returned to the territory from which he was extradited, or

(b)     the person has been given an opportunity to leave the United Kingdom.

(5)          A person is dealt with in the United Kingdom for an offence if--

(a)          he is tried there for it;

(b)          he is detained with a view to trial there for it.

7

Sworn at City of Westminster    }

Magistrates' Court on this  }

  }

17   day of Jan 2008   }         _Benjamin Webb._

Before me:

                   _[signature]_

District Judge (Magistrates' Court)

EXHIBIT 2

8

**ANETTE MUSLIN** states as follows:-

I am a Detective Sergeant in the London Metropolitan Police Force I am the officer in charge of the investigation into the allegations made against PIERRIE ANTOINE BATE as set out below.

### Introduction

The extradition of PIERRIE ANTOINE BATE ("Mr BATE") is sought to England for the purpose of prosecuting for the following offences:

1. **Burglary with intent to rape:**
   Mr BATE on Tuesday 3 October 1995 October 1995 entered a property in ████████████, London ████ with the intent to commit rape, contrary to section 9(1)(a) of the Theft Act 1968.

2. **Indecent Assault:**
   Mr BATE on Tuesday 3 October 1995 at ████████████, London, ████, indecently assaulted Ms Janet Dobson a woman over the age of 16 contrary to section 14(1) and Schedule 2 of the Sexual Offenders Act 1956.

3. **Burglary:**
   Mr BATE on Tuesday 3 October 1995 October 1995 entered the property in ████████████ London, ████ and stole property belonging to Ms Janet Dobson, contrary to section 9(1)(b) of the Theft Act 1968.

### Issuing of Arrest Warrant

On 17 January 2008 I applied for and was granted a warrant for the arrest of PIERRIE ANTOINE BATE by the City of Westminster Magistrates Court which I produce as my exhibit AM/1.

9

**Summary of Evidence**

On Tuesday 3 October 1995 the victim Ms Janet DOBSON, who at the time of the incident was 44 years old, was at home in bed in ███████████, London, ███. In the early hours of the morning she awoke to find a man on her bed supporting himself with one arm and masturbating over her with the other hand he also ejaculated over the bedsheets. When she realised what was happening she shouted at him to leave, he tried to leave by the front door but was unable to as it was double locked, he then walked into the kitchen and exited by a window. She called the police who arrived soon afterwards. After examining the flat she found that £200 and three credit cards had been stolen from her handbag. Ms DOBSON provided a statement to the police on 10 July 2005.

**Investigation**

Police attended the address and seized the bedsheet which had semen on it, this exhibit was seized by Police Constable Andrew BEANEY who sent it for DNA profiling. The scene was also forensically examined for fingerprints and palmprints were taken and sent by Brian Robert LEACH for forensic analysis.

However, at the time of the initial investigation in 1995 the DNA testing procedure was not advanced enough to obtain a full DNA profile from the semen contained on the sheet. A number of fingerprints and palmprints were obtained but no match was found for these prints in 1995. The investigation was therefore closed.

**Further steps taken since 1995**

Between 2004 and 2007 a full review was commenced by the Police Force and Crown Prosecution Service. Statements from the victim and original officers had to be re-obtained as details had been lost and the DNA, fingerprints and palmprints were re-submitted for further forensic analysis.

Mr BATE was convicted of burglary and theft offences in 1996 and as a result his fingerprints and DNA were stored on the National DNA Database.

The semen on the bedsheet was examined using DNA amplification techniques not available in 1995 by Julie-Elizabeth ALLARD and a match was found for Mr BATE.

Mr HOWELL examined the fingerprints and palmprints found inside the property at ███████████ namely: fingerprints on a teapot, palmprints on the inside of the kitchen window frame and a fingerprint on the drainpipe outside the kitchen window and found them to be a match for Mr BATE.

### Location in the United States of America

Mr BATE is an American citizen and is know to reside at


Northridge,
CA ██████
USA

### Details of Mr BATE

Mr BATE is an American citizen born ████████ 1974 in California, USA who has held US passport number 035120605, this expired in 2004. He is a black male approximately 5' 9" tall with brown eyes and black hair. I attach a copy of his photograph as my exhibit AM/2 and a copy of his fingerprints as my exhibit AM/3. I confirm that the photograph in AM/2 of Mr Bate was taken in 1996 at the same time as the fingerprints in exhibit AM/3 identifying Mr Bate.

Mr BATE has a criminal record in California and England. I attach a copy of his previous convictions as my exhibit AM/4. He has one conviction in 1993 and one in 1999 in California, the first for which he was fined and received a prison sentence of 120 days for the second. He has seven convictions in England between January and July 1996 for which he received a total of eleven months and one week imprisonment.

**11**

Sworn at City of Westminster      }
                                  }
Magistrates' Court on this  }
                                  }
17  day of Jan  2008  }

Before me:

District Judge (Magistrates' Court)

12

EXHIBIT NO. AM/1



# CITY OF WESTMINSTER MAGISTRATES COURT
## (2660)

To each and all of the Constables of the Metropolitan Police

ACCUSED: Pierre Antione BATE

DATE OF BIRTH: ███████ 1974

ADDRESS: █████████, North Ridge, CA ███, USA

OFFENCES:

1. BURGLARY WITH INTENT TO RAPE, contrary to section 9(1)(a) of the Theft Act 1968.

2. INDECENT ASSAULT, contrary to section 14(1) and Schedule 2 of the Sexual Offenders Act 1956.

3. BURGLARY, contrary to section 9(1)(b) of the Theft Act 1968.

On Tuesday 3rd October 1995 Ms Dobson was asleep alone in bed in her basement flat, at ███████████████. She was woken by a male intruder who was lying on top of her and masturbating over her. The male then ejaculated over the bed sheets, stole property from within the flat and made good his escape. A full forensic review has now been completed on this case and a DNA profile links this accused to the crime. The forensic evidence strongly indicates that the accused is linked to these offences. The forensic evidence includes both DNA and fingerprints..

*and on oath*

Information in writing/having this day been laid before me on oath, the undersigned, by Detective Sergeant Annette Maslin on Thursday 17 January 2008. That the accused committed the offences of which the particulars are given above.

DIRECTION:
You, the constables of the Metropolitan Police Force, are hereby required to arrest the accused and to bring the accused before the Magistrates' Court at Horseferry road immediately unless the accused is released on bail as directed below.

BAIL: **NO BAIL**

DATE: *17th January 2008*

District Judge (Magistrates' Court)
M.C.A.4 Warrant. First Instance.

**13**

**EXHIBIT 2**

EXHIBIT NO. AM/2



14

THE FORM MUST BE COMPLETED IN BLOCK LETTERS USING BLACK INK

**EXHIBIT No.** AM/3

NFU

NIB/CRO Number if known (in pencil)

**21984/96 W**

Arrest/Summons No

SC 00 00 00 530761

Surname BATE

Forename(s) Pierre Antoine

Alias/Maiden Name

Place of Birth Los Angeles. U.S.A.

Full Date of Birth [ ] 1974

Offence Handling S. Goods

**PRISONER'S SIGNATURE—DATA PROTECTION**
These fingerprints will form part of a computerised collection; as such they may be used by Police Forces for identification and crime investigation purposes. I understand I may witness their destruction if I am cleared of the offence and I apply within 5 days of notification.

Signature x P. Bate

Impressions taken by:—
Name, Rank/Number J. Walker. 175046 D/c.

Force Metropolitan. Date 29'1'96.

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| | 00 15 | 12 | 16 | 0 14 | 14 |
| | 00 25 | | | 0 17 | 18 |

| | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|
| | 14 | I 15 | 14 | 16 | 16 |

Offence Code 00

Sex (M/F/U) M   Ethnic Appearance (0 – 6) 3   Year of Birth 74   Force Station Code (of offence) 01 BC

| 1—RIGHT THUMB | 2—RIGHT FORE | 3—RIGHT MIDDLE | 4—RIGHT RING | 5—RIGHT LITTLE |
|---|---|---|---|---|



| 6—LEFT THUMB | 7—LEFT FORE | 8—LEFT MIDDLE | 9—LEFT RING | 10—LEFT LITTLE |
|---|---|---|---|---|



Plain impressions of the four fingers of the LEFT HAND taken simultaneously

Plain impressions of THUMBS taken simultaneously
LEFT   RIGHT

Plain impressions of the four fingers of the RIGHT HAND taken simultaneously

15

55

EXHIBIT 2

Taken 2.2.96   Checked   Date 2.2.96   Searched

Ingredients of Name
*BATE*

On on *29th Jan. 1996.*

Identify this item as Exhibit Identity Number

*N471.*

SIGNATURE

*[signature]*

Place of residence and area(s) requested

*Chelsea, Kensington*
*Fulham, Battersea*
*Riverains*

Injured or missing fingers, nature and date of loss

*Nil*

FEB 9 6

N.F.O. STAMP
NATIONAL IDENTIFICATION SERVICE
01 FEB 1996

Charged ✓        Cautioned ▢

Court Appearing *HORSEFERRY ROAD MAGS*

Date *30th January 1996*

Officer in case *T.J. Theoбoлos*

Supervisor's Signature and Number *[signature]*

**PLEASE ENSURE THAT ALL RED BOXES HAVE BEEN COMPLETED**

Station Code *A/RC*    Custody No. *238/96*

EXHIBIT LABEL TO BE COMPLETED BY OFFICER
TAKING FINGERPRINTS.

**THIS FORM MUST BE FORWARDED AS SOON AS POSSIBLE TO:—
THE OFFICER IN CHARGE,
NATIONAL FINGERPRINT OFFICE,
NEW SCOTLAND YARD,
LONDON, SW1H 0BG**

PRINTRAK

HEALTH AND SAFETY Forms contaminated with blood or other body fluids, or those used to fingerprint persons known, or suspected to be suffering from or carriers of communicable disease must be sealed in accordance with Health and Safety requirements. (Ref. P.G.S.N. 4.10.93.)    Nature of disease

*IMPORTANT — THIS FORM MUST NOT BE MARKED BELOW THIS LINE*

TRUE COPY OF THE FINGER PALM PRINT FORM
FILED IN THE NATIONAL FINGERPRINT ARCHIVE
IN THE NAME OF:

*Pierre Antoine BATE*

BEARING REFERENCE NUMBER:

*21984/96W*

SIGNATURE *[signature]*

FOR DIRECTOR, NATIONAL IDENTIFICATION
SERVICE, NEW SCOTLAND YARD.

*SCD4(4)*

*15 JAN 2008*

**16**

*2 copies to ICPO 14-2-96*
*1 copy to FBI 16-2-96*

EXHIBIT 2 

PALM PRINT FORM
use a separate form
for each hand.

C.R.O. Number
21984-96W
N/T.



Surname. RATE

Signature. P. B.

Forenames. Peire Antoine

Impressions taken by DC WALKER

Rank. DC

Date 29'/1/96

Force/Station Code | O | 1 | B | C |

Rolled forefinger
AFTER signature.

Remarks:—



17

57

EXHIBIT 2 FORM 4814

RIGHT

TRUE COPY OF THE ~~FINGER~~/PALM PRINT FORM
FILED IN THE NATIONAL FINGER-PRINT ARCHIVE
IN THE NAME OF:

Peirre Antoine BATE

BEARING REFERENCE NUMBER:

21984 / 96 W

SIG...

FOR DIRECTOR, CRIMINAL IDENTIFICATION
SERVICE, REGIONAL IDENTIFICATION

SCD4(4)

15 JAN 2008

18

EXHIBIT 2

 **PALM PRINT FORM**
use a separate form
for each hand.

| C.R.O. Number |
|---|
| NT |

96 0000 00 83076 ✓



urname. BATES

Signature. X A B

prenames. Peire Antoine

Rolled forefinger
AFTER signature.

Remarks:—

npressions taken by. DC WALKER 175016.

ank. D.C.    Date. 29.1.96.



orce/Station Code    01 BC

**19**

59

EXHIBIT 2 FORM 4814

LEFT

TRUE COPY OF THE ORIGINAL FINGERPRINT
FILED IN THE NATIONAL FINGERPRINT ARCHIVE
IN THE NAME OF:

_____Peirce Antoine BATE_____

BEARING IDENTIFICATION NUMBER:

(N/A)

SIGNATURE:

FOR AND ON BEHALF OF SCD4(4)

15 JAN 2008

**20**

60                                    EXHIBIT 2

EXHIBIT No. AM /4

29/06/06 15:26

THIS PRINTOUT IS PRODUCED FOR THE USE OF THE COURT, DEFENCE AND PROBATION
SERVICE ONLY AND MUST NOT BE DISCLOSED TO ANY OTHER PARTY

DATA PROTECTION LEGISLATION
THESE PERSONAL DATA ARE PROVIDED TO YOU FOR THE AGREED SPECIFIED PURPOSE(S).
KEEP THE DATA SECURE AND PROTECT THEM AGAINST LOSS OR UNAUTHORISED ACCESS.
---------------------------

```
*********************************************
*                                           *
*                                           *
*        COURT/DEFENCE/PROBATION PRINT       *
*                                           *
*                                           *
*********************************************
```

PRINT OF PNC RECORD - PNCID : 96/48253J
-----------------------------------------

PRINT FOR : DS MASLIN - COLD CASE ENQYS

TOTAL NUMBER OF PAGES ATTACHED  3

PLEASE NOTE THAT IN THE ABSENCE OF FINGERPRINTS, IDENTITY
CANNOT BE POSITIVELY CONFIRMED WITH THE SUBJECT OF YOUR ENQUIRY
AND YOU SHOULD CONFIRM THE INFORMATION WITH THE PERSON

21

YOUR ATTENTION IS DRAWN TO THE PROVISIONS OF
THE REHABILITATION OF OFFENDERS ACT 1974

22

EXHIBIT 2

29/06/06 15:26                                            PAGE 1   OF 3

THIS PRINTOUT IS PRODUCED FOR THE USE OF THE COURT, DEFENCE AND PROBATION
            SERVICE ONLY AND MUST NOT BE DISCLOSED TO ANY OTHER PARTY

            YOUR ATTENTION IS DRAWN TO THE PROVISIONS OF
                THE REHABILITATION OF OFFENDERS ACT 1974

                        DATA PROTECTION LEGISLATION
THESE PERSONAL DATA ARE PROVIDED TO YOU FOR THE AGREED SPECIFIED PURPOSES.
KEEP THE DATA SECURE AND PROTECT THEM AGAINST LOSS OR UNAUTHORISED ACCESS.
                    ---------------------------

SURNAME       : BATE
FORENAME(S)   : PIERRIE ANTOINE
BORN          : ██████/74  CALIFORNIA
ADDRESS       : ████████████████
              SW16

CRO NUMBER    : ██████                         PNCID : ██████████

ALIAS NAMES  (4)

  1 BATE, PEIRRE
  2 BATE, PIERRE ANTOINE
  3 BATE, PIERRE ANTONIO
  4 BATE, PIERRIE
----------------------------------------------------------------------
            SUMMARY OF CONVICTIONS AND REPRIMANDS/WARNINGS/CAUTIONS
  ----------------------------------------------------------------

     CONVICTION(S)  :   5                OFFENCE(S)  :     9

     DATE FIRST CONVICTED :  23/08/93    DATE LAST CONVICTED :  27/04/99

            2 FRAUD AND KINDRED OFFENCES            (1996)
            7 THEFT AND KINDRED OFFENCES            (1993-1999)
--------------------------------------------------------------------------
                NO REPRIMANDS/WARNINGS/CAUTIONS
--------------------------------------------------------------------------
END OF SUMMARY OF CONVICTIONS AND REPRIMANDS/WARNINGS/CAUTIONS

**23**

EXHIBIT 2




29/06/06 15:26
NAME: BATE, PIERRIE ANTOINE
-----------------------------------------------------------------
                        CONVICTION(S)
                        -------------

1.    23/08/93            SANTA MONICA MUNICIPAL COURT,CA

    1.  FOREIGN LEG/THEFT                        FINE
        ON 21/08/93 (PLEA:NOT KNOWN)
        THEFT ACT 1968 s.1
-----------------------------------------------------------------

2.    19/08/96            MARYLEBONE MAGISTRATES

    1.  OBTAINING PROPERTY BY DECEPTION          IMPRISONMENT 7 DAYS
        ON 11/07/96 (PLEA:GUILTY)
        THEFT ACT 1968 s.15
    **  OFFENCE COMMITTED ON BAIL  **

    2.  OBTAINING PROPERTY BY DECEPTION          IMPRISONMENT 7 DAYS
        ON 13/07/96 (PLEA:GUILTY)                CONCURRENT
        THEFT ACT 1968 s.15
    **  OFFENCE COMMITTED ON BAIL  **
-----------------------------------------------------------------

3.    22/08/96            SOUTHWARK CROWN

    1.  BURGLARY AND THEFT - DWELLING            IMPRISONMENT 8 MTHS
        ON 12/01/96 (PLEA:GUILTY)                CONCURRENT
        THEFT ACT 1968 s.9(1)(b)

    2.  HANDLING STOLEN GOODS (RECEIVING)        IMPRISONMENT 8 MTHS
        ON 12/01/96 (PLEA:GUILTY)                CONCURRENT
        THEFT ACT 1968 s.22(1)

    3.  GOING EQUIPPED FOR THEFT (OTHER THAN     IMPRISONMENT 8 MTHS
        THEFT OF MOTOR VEHICLE)                  CONCURRENT
        ON 12/01/96 (PLEA:GUILTY)
        THEFT ACT 1968 s.25

    4.  HANDLING STOLEN GOODS (RECEIVING)        IMPRISONMENT 8 MTHS
        ON 29/01/96 (PLEA:NOT KNOWN)
        THEFT ACT 1968 s.22(1)
-----------------------------------------------------------------

4.    31/10/96            MARYLEBONE MAGISTRATES

    1.  BURGLARY AND THEFT - DWELLING            IMPRISONMENT 3 MTHS
        ON 10/07/96 (PLEA:GUILTY)
        THEFT ACT 1968 s.9(1)(b)
-----------------------------------------------------------------

5.    27/04/99            LOS ANGELES COUNTY COURT

    1.  FOREIGN LEG/HANDLING                     IMPRISONMENT 120 DAYS
        THEFT ACT 1968 s.22
                                                 ----------------------
-----------------------------------------------------------------
END OF CONVICTION REPORTS

**24**

EXHIBIT 2

```
29/06/06 15:26                                         PAGE 3   OF 3
NAME: BATE, PIERRIE ANTOINE                            PNCID:
-----------------------------------------------------------------------

                        LAST PERIOD IN CUSTODY
                        ----------------------

     PRISONER NUMBER      :  FH3488
     LOCATION             :  FORD
     ACTUAL RELEASE DATE  :  13/12/96
     SENTENCE EXPIRY DATE :  02/03/97
     REASON FOR RELEASE   :  AUTO RELEASE (CJA 91)
     LICENCE TYPE         :  AT RISK NOTICE
     LICENCE CONDITIONS   :
        RELEASED UNDER THE PROVISIONS OF S.33 (1)(A) C.J ACT 1991


-----------------------------------------------------------------------

END OF CUSTODY DETAILS

END OF PNC RECORD PRINT
```

25

EXHIBIT 2



# CITY OF WESTMINSTER MAGISTRATES' COURT.

### This 17th day of January 2008

I,                          THE UNDERSIGNED, one of the District Judges (Magistrates' Courts) sitting at City of Westminster Magistrates' Court hereby certify that the written and photographic matters contained in the foregoing pages are the depositions of ANNETTE MASLIN and BENJAMIN KEITH and true copies of exhibits AM/1 - AM/4 referred to in the said depositions and the warrant issued 17th day of January 2008 for the apprehension of PIERRIE ANTOINE BATE laid and sworn before me at City of Westminster Magistrates' Court on this 17th day of January 2008.

GIVEN under my hand and seal, this 17th day of January 2008 at the City of Westminster Magistrates' Court.

District Judge (Magistrates' Court)



**26**

EXHIBIT 2

Exhibit 3

# THE EXTRADITION

# OF

# PIERRE ANTOINE BATE

# FROM

# THE UNITED STATES OF AMERICA

# SUPPLEMENTAL BUNDLE 1

EXHIBIT 3

THE EXTRADITION

OF

PIERRIE ANTOINE BATE

FROM

THE UNITED STATES OF AMERICA

SUPPLEMENTRY BUNDLE 1

## INDEX

| DOCUMENT | PAGE NOS |
| --- | --- |
| Statement of Anette Maslin | 1 |
| Jurat | 2 |

3

EXHIBIT 3

**ANETTE MASLIN** states as follows:-

I am a Detective Sergeant employed by the London Metropolitan Police Force I am the officer in charge of the investigation into the allegations made against the requested person, Pierrie Antoine Bate ("the Requested Person"). I make this supplemental deposition to clarify the aliases by which the Requested Person is known.

In my first deposition I exhibited as AM/4 the Requested Person's criminal record. On that criminal record his known aliases are listed. I can confirm that the arrest warrant was issued for the requested person under the name of Pierrie Antoine Bate and each of his 4 aliases.

His known aliases are as follows:

1.  Pierre Bate
2.  Pierre Antoine Bate
3.  Pierre Antonio Bate
4.  Pierrie Bate

The DNA, fingerprints and palmprints taken in 1996 relate to Pierrie Antoine Bate and all of his aliases.

Further to my first deposition there was a typographical error in the spelling of my name. In that deposition my name was stated as Annette Muslin, however the correct spelling of my last name is Maslin.

**Sworn at City of Westminster**    }

    }

**Magistrates' Court on this**    }

    }

*8*    day of *May* 2008    }

_____

**ANNETTE MASLIN**

**Before me:**

_____

**District Judge (Magistrates' Court)**

**EXHIBIT 3**



# CITY OF WESTMINSTER MAGISTRATES' COURT.

### This 8th day of May 2008

I,    C.S.R Tubbs    THE UNDERSIGNED, one of the District Judges (Magistrates' Courts) sitting at City of Westminster Magistrates' Court hereby certify that the written and photographic matters contained in the foregoing page is the supplemental deposition of ANNETTE MASLIN in relation to the extradition request of PIERRIE ANTOINE BATE laid and sworn before me at City of Westminster Magistrates' Court on this 8th day of May 2008.

GIVEN under my hand and seal, this 8th day of May 2008 at the City of Westminster Magistrates' Court.

District Judge (Magistrates' Court)



EXHIBIT 3